Bayard et al                                    Civil Action No. 6:13-1536

Versus                                          Magistrate Judge Carol B. Whitehurst

Cameron Inc                                     By Consent of the Parties

## MEMORANDUM RULING AND ORDER

Before the Court is Defendant, Cameron Inc.'s, Motion for a New Trial
Pursuant to Rule 59 or in the Alternative for a Remittitur [Red. Doc. 155], Plaintiff,
Brayton Bayard's, Memorandum in Opposition [Rec. Doc. 162], and Intervenor
American Interstate Insurance Company's Memorandum in Opposition for the
reasons set forth in Plaintiff's Memorandum in Opposition [Rec. Doc. 158]. For the
following reasons, Cameron's Motion will be GRANTED IN PART AND DENIED
IN PART.

## I. BACKGROUND

This case arises out of an incident that occurred on November 30, 2011, at an
enclosed facility owned and operated by Cameron Inc. ("Cameron"), located in the
Port of Iberia, Iberia Parish, Louisiana. On the day of the incident, Plaintiff was
working as a driver and rigger for Berard Transportation, Inc. ("Berard") on a job at
Cameron's enclosed facility. The job involved lowering and securing a large
cylindrical vessel known as a desalter onto a mobile transporter known as a

Goldhofer or crawler with wooden chocks and industrial chain, then transporting the desalter from Cameron's facility to an adjoining storage yard owned and operated by Cameron. The desalter was 82 feet, 2 inches in length, 14 feet, 5 inches in diameter, and weighed 159 tons.

After the vessel was lowered onto the Goldhofer by a crane owned by Cameron and operated by Cameron's employee, Ravis Belaire, Jr., Plaintiff, along with his co-employees and several employees of Cameron, then wedged two wooden chocks on each side of the vessel to secure the vessel and prevent it from rotating or falling while it was being moved. After the chocks were in place, Plaintiff and his co-employees and Cameron employees stationed themselves on opposite sides on top of the Goldhofer and around the chocks in order to wrap an industrial chain around the chocks and use a ratchet binder to link the chain together and tighten it to secure the chocks. After the chain on the opposite side of the Goldhofer from Plaintiff was wrapped around the chocks and tightened with a ratchet binder, the ratchet binder was passed to Plaintiff in order for him to secure the chain around the two chocks located on his side of the Goldhofer. As Plaintiff attempted to attach the end of the ratchet binder onto the end of the chain, a threaded end of the ratchet binder came apart from the body of the ratchet binder. Plaintiff fell off the Goldhofer and landed on the floor injuring his wrist.

On November 29, 2012, Plaintiff filed suit in the 16th Judicial District Court, Iberia Parish, Louisiana. Cameron removed the case to this Court on the basis of federal diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332. *R. 1*. Cameron filed an Answer raising a number of affirmative defenses and requesting trial by jury. *R. 5*. American Interstate Insurance Company, as the compensation insurer and subrogee and co-owner of the rights of Plaintiff, filed a Petition of Intervention for compensation benefits and medical expenses paid to or on behalf of Plaintiff. *Id*.

This matter was tried by a jury on February 26-28 and March 1, 2018. *R. 141, 142, 144, 145*. The jury returned a verdict in favor of Plaintiff in the amount of $4,271,300.00, finding comparative fault as follows: Cameron – 65%, Berard - 25% and Plaintiff – 10%. *R. 150*. A Judgment was entered on March 6, 2018. *R. 152*. Cameron filed this motion seeking a new trial pursuant to Rule 59 or alternatively a remittitur and amendment to the Judgment.

## II. LEGAL STANDARD

Cameron seeks a new trial pursuant to Federal Rule of Civil Procedure 59. Rule 59(a) provides that a district court may grant a new trial "on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a).

Under Rule 59, a new trial may be granted if "the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, *773 F.2d 610, 613 (5th Cir. 1985)*; *see also Wright v. National Interstate Insurance Co.*, 2018 WL 2017567, at \*3 (E.D.La., 2018). "A district court, however, should attempt to avoid substituting its judgment for the jury's considered verdict, so as to not violate the parties' Seventh Amendment rights." *McFadden*, 2006 WL 3087164, at \*2. "If the jury's verdict is 'clearly within the universe of possible awards which are supported by the evidence,' then a district court may not properly grant a new trial based merely on the inadequacy of the damage award." *Id*. (citing *Brun–Jacobo v. Pan Am. World Airways, Inc.*, *847 F.2d 242, 246 (5th Cir. 1988)*). "The Fifth Circuit has stated that it will not interfere with the factfinder's award of damages unless it is 'so inadequate as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial.' " *Id*. (quoting *Munn v. Algee*, 924 F.2d 569, 578 (5th Cir. 1991)).

Because the matter is before the Court on diversity jurisdiction, the new trial standards of Louisiana law are applicable. *See Foradori v. Harris*, *523 F.3d 477, 498 (5th Cir. 2008)* ("[I]n an action based on state law but tried in federal court by reason of diversity of citizenship, a district court must apply a new trial or remittitur

standard according to the state's law controlling jury awards for excessiveness or inadequacy....")

Under Louisiana law, "[a] new trial shall be granted ... [w]hen the verdict or judgment appears clearly contrary to the law and evidence." LA. CODE CIV. P. 1972(1). "The trial court's discretion in ruling on a motion for new trial is great." *Davis v. Wal–Mart Stores, Inc*., 774 So. 2d 84, 93 (La. 2000). "Whether to grant a new trial requires a discretionary balancing of many factors." *Id*. As stated by the Louisiana Supreme Court:

> The fact that a determination on a motion for new trial involves judicial discretion, however, does not imply that the trial court can freely interfere with any verdict with which it disagrees. The discretionary power to grant a new trial must be exercised with considerable caution....Fact finding is the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury's responsibility. A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations and must be viewed in that light. Thus, the jury's verdict should not be set aside if it is supportable by any fair interpretation of the evidence.

*Id*.

In making this determination, the trial court must balance the great deference given to the jury as the factfinder and the discretion bestowed upon it in reviewing the motion, but the scales are "clearly tilted in favor of the survival of the jury's verdict." *Id.* at 93–94. The decision is to be made on a case-by-case basis. *Id*. at 94.

Furthermore, the Fifth Circuit has repeatedly held that "the decision to grant or deny a motion for new trial generally is within the sound discretion of the trial court and will not be disturbed unless there is an abuse of that discretion or a misapprehension of the law." *Dixon v. International Harvester Co.*, 754 F.2d 573, 586 (5th Cir. 1985); *see also e.g., Prytania Park Hotel, Ltd. v. General Star Indemnity Co.*, 179 F.3d 169, 175 (5th Cir. 1999); *Mitchell v. Lone Star Ammunition, Inc.*, 913 F.2d 242, 252 (5th Cir. 1990) . "[R]econsideration of a judgment is an extraordinary remedy which should be used sparingly. Rule 59 motions may not be used to relitigate old matters, raise new arguments, or present evidence that could have been raised prior to entry of the judgment." *Campbell v. St. Tammany Parish School Bd*., 1999 WL 777720, at *1 (E.D.La.,1999) (citing Wright, Miller & Kane, *Federal Practice and Procedure*: Civil 2d § 2810.1).

### III. ANALYSIS

A. Motion For New Trial

In its motion seeking a new trial, Cameron asserts that the jury's verdict is clearly contrary to the law and against the weight of the evidence in the following respects: (1) imposing liability on Cameron based on Cameron's duty to act even though the law imposed no duty on Cameron because Plaintiff was its independent contractor; (2) allocating 65% of the comparative fault to Cameron and only 25% to Berard and 10% to Plaintiff; and (3) allocating fault because the jury was "frustrated"

and angry" and was used the method for allocating fault "as a vehicle for punishing Cameron."

*1. Independent Contractor*

Under Louisiana law, a principal cannot be held liable for the negligent acts of an independent contractor when the independent contractor is performing duties for which it was  retained under a contract. *Coulter v. Texaco, Inc.*, 117 F.3d 909, 911–12 (5th Cir. 1997). The rule is  subject to two exceptions, only one of which is pertinent in this case. Liability may be imposed upon a principal for the negligent acts of an independent contractor only when the principal "contractually  reserved" the right to supervise or control the work of the independent contractor. *LeJeune v. Shell Oil Co.*, 950 F.2d 267, 270 (5th Cir. 1992). Operational control, however, only arises if the principal has direct supervision over the step-by-step process of accomplishing the work, such that the independent contractor is not  entirely free to do the work in its own way. However, while one who employs an independent contractor escapes liability for the negligence of such contractor, he is nevertheless answerable for his own negligence. *Smith v. Indiana Lumbermens Mut. Ins. Co.*, 175 So.2d 414, 416 (La. App., 1965) (citing 27 Am.Jur., pp. 508-509, Independent Contractors, § 30).

Plaintiff argues that  the evidence at trial proved that Cameron and Berard were working together on a "shared job with shared responsibilities" when Plaintiff

was injured. *R. 157.* Plaintiff cites the trial testimony of Cameron's crane operator, Ravis Belaire, who had operated the cranes to lift the desalter on the date of Plaintiff's accident. Belaire confirmed that as the crane operator for Cameron he was in charge of the lift. He further confirmed that Cameron required him to ensure that Berard had the right equipment at the job and that it was safe for use, even if its handing a ratchet binder. While he testified that a job safety analysis would have been done before the job at issue was performed, he stated that he couldn't remember whether a job safety analysis was done before Plaintiff's accident occurred. Plaintiff argues that Belaire's testimony as to the crane operator's supervisory role over the Berard employees, the equipment, including the ratchet binder, and the operation itself, gave Cameron certain responsibilities which the jury interpreted as control.

Belaire's testimony as to these duties was confirmed by Plaintiff's safety expert, Robert Borison. Borison opined that Cameron's aspect of the job didn't finish until Cameron's riggers disconnected Cameron's crane from the transporter. This testimony went unchallenged at trial. Because Berard employees as well as Cameron employees were on the job site, both companies were responsible for holding a job safety analysis with their own aspect of the job covered in their analysis. In summary, as to Cameron's responsibility, Borison opined that it was Cameron's facility, Cameron's vessel, Cameron's crane and Cameron's rules and regulations that Berard had to follow. He stated that both Cameron's and Berard's

employees should be part of a job safety analysis as they were both put in danger during the operation performed. Borison testified that he reviewed documents for job safety analyses done for Cameron jobs performed by Berard on August 2 and August 7, 2011, but could not locate such a document for a job safety analysis done on the date of Plaintiff's accident, November 30, 2011.

The jury instructions given to the jury were clear about the proper law to consider and the effect of certain findings of fact. In particular, the Court provided jury instructions related to independent contractor which were submitted by Cameron and addressed the independent contractor issue of which Cameron now complains. Cameron's counsel specifically pointed out the language of these instructions in his closing argument and advised the jury that when the facts were applied, Cameron could not be found liable.

"A jury verdict must be upheld unless 'there is no legally sufficient evidentiary basis for a reasonable jury to find' as the jury did." *Harrington v. Harris*, 118 F.3d 359, 367 (5th Cir.1997) (quoting Fed.R.Civ.P. 50(a)(1)). The Court "should consider all of the evidence ... in the light and with all reasonable inferences most favorable to the party opposed to the motion." *Guilbeau v. W.W. Henry Co.*, 85 F.3d 1149, 1161 (5th Cir. 1996). It is the jury's responsibility to weigh conflicting evidence, draw inferences from that evidence, and determine the relative credibility of the witnesses. Granting a motion is proper only "[i]f the facts and inferences point

so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." *See Gutierrez v. Excel Corp.*, 106 F.3d 683, 686 (5th Cir.1997).

After considering the evidence adduced at trial, and with the deferential standard of review in mind, the Court finds that the jury's verdict is supportable by a fair interpretation of the evidence and will therefore not be set aside.

### 2. Allocation of Fault

Cameron also contends that the verdict on allocation of fault is contrary to the weight of the evidence. In the Verdict Form the jury assigned 65% of the fault to Cameron, 25% of the fault Berard and 10% of the fault to Plaintiff. Cameron asserts that the majority of the fault should rest with Plaintiff, and after that, Berard. Cameron argues that the causal relationship between Plaintiff's negligent conduct and his injury is a direct one.

Cameron submits that the determination of whether a jury erred in its allocation of fault is generally guided by the following factors: (1) whether the conduct was mere inadvertence or engaged in with an awareness of the danger involved; (2) the magnitude of the risk created by the conduct, including the number of persons endangered and the potential seriousness of the injury; (3) the significance of what the actor was seeking to attain by this conduct; (4) the actor's superior or inferior capacities; and (5) the particular circumstances, such as the existence of an

emergency requiring a hasty decision. *Watson v. State Farm Fire and Cas. Ins. Co.*, 469 So.2d 967, 974 (La. 1985).

Plaintiff argues that the jury examined the facts and evidence set out in the foregoing analysis and split the fault between all of the parties at the Cameron facility on the day of the accident. *R. 157*. Plaintiff further argues that the jury instructions issued by the Court included over two pages related to the allocation of fault between the parties and contained an explicit recitation of the factors the jury should consider when making the allocations.

The Court finds there was a sufficient evidentiary basis for the jury's decision to allocate fault as it did in the Verdict Form. The Court properly instructed the jury on the allocation of fault. Indeed, the Court's Jury Instructions as to allocation of fault was virtually identical to the factors for allocation of fault which Cameron now asserts:

> When determining percentages of fault, you should consider the nature of the conduct of each person or entity and the extent of the causal relationship between the conduct and the injury. When assessing the conduct of a person or entity you may consider: (1) whether the conduct resulted from inadvertence or involved an awareness of the risk; (2) how great the risk created by the conduct was; (3) the significance of what was sought by the conduct; (4) the capacities of the actors, whether superior or inferior; (5) any extenuating circumstances which might have required the person or entity to act in haste, without proper thought.

Under these instructions, the jury evaluated the independent fault of Cameron, Plaintiff and Berard. From the evidence adduced at trial the jury could have believed that the accident was caused by failures committed by Cameron and Berard, and by Plaintiff's own fault. In particular, the Court notes the trial testimony of Belaire as to his role as Cameron's crane operator and Cameron's duties and shortcomings on the day of the accident, as well as the testimony of Borison who opined that Cameron asserted control over the operation from the time the cranes lifted the desalter until the chains were in place to secure it to the transporter and the cranes were detached. Despite the lack of a document in the record indicating that a joint safety analysis was performed on the date of Plaintiff's accident, both Belaire and Borison testified that Cameron would have or should have performed such an analysis before the job at issue began. Accordingly, Cameron is not entitled to judgment as a matter of law because the jury's allocation of fault and damages award was supported by substantial evidence. *See White v. Great West Cas. Co*., 2010 WL 1716777, at *4 (W.D.La.,2010). The verdict in this case was supported by the evidence and the Rule 59 motion on the ground of allocation of fault is denied.

### 3. *Passion, Bias and Improper Motive*

Cameron further argues that a new trial is warranted because of "passion, prejudice and improper motive exhibited by the jury." *R. 155, p. 17*. Cameron submits that the only reasonable explanation for the jury's allocation of 65% of the

fault to Cameron is because the jury "became frustrated and it became angry" and "chose a method for allocating fault as a vehicle for punishing Cameron." *Id.*

Cameron points to the jury's notes to the Court. In the first note, the jury inquired as to whether Cameron's company representative, Colin Findlay, was an attorney, an insurance adjuster or a representative of the company. Cameron contends that the jury's objective in asking about Findlay was "clearly" to "send a message" and wanted to make sure there was a company representative present. The Court cannot agree with Cameron's theory. Rather, there are other possible reasons for the jury's inquiry. One reason is that the jury was unsure of Findley's relationship to Cameron because counsel for Plaintiff called him in his case-in-chief yet counsel for Cameron never re-called him in Cameron's case-in-chief even though Findley sat at Cameron's table.

In the second note the jury asked what was the lowest amount of fault that could be allocated to a party. Cameron contends "it is obvious" the jury was either trying to assign no fault to plaintiff or no more than 1% even though counsel for Plaintiff acknowledged Plaintiff's fault in his closing. Contrary to Cameron's assertion, however, the jury's question does not indicate that it is about only Plaintiff's fault; nor is there any indication that the jury was referring to any specific

party or entity, especially in light of both counsel's closing arguments that all parties were at fault.[1] Cameron's motion is denied in regards to the jury's fault allocation.

## B. Remittitur

Alternatively, Cameron moves under Rule 59(e) to reduce the judgment awarded by the jury in this matter, an award totaling $4,271,300.00. Because this is a diversity action, the Court "must apply a new trial or remittitur standard according to the state's law controlling jury awards for excessiveness or inadequacy." *Foradori v. Harris*, 523 F.3d 477, 497 (5th Cir. 2008).

Cameron moves for remittitur as to three items of special damages: future medical expenses and past and future loss of earnings. The Jury Verdict Form reflects the following breakout amounts of damages awarded pertinent to Cameron's motion for remittitur:

| | |
|---|---|
| Future medical expenses | $997,000 |
| Past lost wages/Loss of earning capacity | $455,000 |
| Future lost wages/Loss of earning capacity | $1,594,800 |

### 1. *Future Medical Expenses*

Cameron contends that the jury awarded $28,579.00 greater than the value supported by the testimony of Plaintiff's experts. Based on her testimony, Plaintiff's

---

[1] Cameron stated in closing "the actors in this particular work that led to this accident are primarily [Plaintiff] and Berard" and "fault, if any is assigned [to Cameron] is very, very small . . . no greater than 10 percent."

witness, Shelly N. Savant, M.D., a life care planner, assigned a value of $847,326.50 to Plaintiff's future medical needs for the rest of his life[2], which included: $6,699.00 for durable medical items; $25,318 for evaluations; $92,787 for medical care; $177,000 for home care; $178,725.00 for therapeutic services; $191,000.00 for medications; and $198,000.00 for plan administration. Denis Boudreaux, an economist called by Plaintiff, testified that the overall value of future medical expenses, as purported by Dr. Savant, should be adjusted to account for inflation and other price influencing factors that largely would affect the cost of medication, but also hospital and therapy costs. In particular, Boudreaux stated that the cost of Plaintiff's medicines would increase 4.7 percent over time. Following his adjustments for "everything in the plan, everything in the medication, all the services that Dr. Savant and Gorman have all testified to," Boudreaux stated the overall present value of future medical expenses was $968,421.00. Thus, the jury award of $997,000, was $28,579.00 more than Dr. Savant and Boudreaux's calculation of Plaintiff's future medical needs.

While Plaintiff states that Dr. Savant recognized in her report that some of the costs in the plan reflected "minimum supportive assistance with higher costs possible," the jury did not have access to the report and the transcript of Dr. Savant fails to provide any such statement. Plaintiff further states that Dr. Henderson and

---

[2] Dr. Savant based her calculations on Plaintiff lifetime spanning 33 more years.

Dr. Blackburn indicated that Plaintiff's future physical therapy and psychological treatment may be greater than anticipated based on his chronic pain and difficulty in obtaining employment. In her testimony, however, Dr. Savant clearly stated that as Plaintiff's life care planner, "the recommendations that I make are things that I would normally do as a doctor… it's always my preference to go back to the treating doctors and tailor it as best we can to the patient." As to Dr. Henderson and Dr. Blackburn's testimony as to the possibility of Plaintiff's pain and psychological flare-ups, Savant stated, "I reviewed [the June 2017 plan] line by line with the treating doctor, Dr. Henderson and I review the aspects of the plan that were appropriate to Dr. Blackburn's with him …. had he wanted any amendment in … any [] item in the plan, I would have amended it." More specifically, Savant testified that her allocation of $178,725 for therapeutic services "consists of an allotment for the occupational therapy sessions, physical therapy, pain psychology, psychiatry appointments" in order for Plaintiff to have maintenance on his hand, for him to have appointments with his doctors, including Dr. Blackburn, for the rest of his life. The testimony establishes that Dr. Savant carefully considered of all of Plaintiff's medical records as well as all of the input from his treating physicians in evaluating Plaintiff's future medical needs and clearly conveyed her efforts to the jury. There is no evidence that $28,579.00 more than the amount to which Dr. Savant testified would be needed by Plaintiff.

Based on the foregoing evidence the Court finds that the jury could not have determined and/or believed that a higher amount than the amount calculated by Dr. Savant and upwardly adjusted by Dr. Boudreaux would be needed to accommodate Plaintiff's future medical needs.

### 2. *Past and Future Lost Wages/Loss of Earning Capacity*

Plaintiff sought awards for past and future loss of wages based on the testimony and calculations of Denis Boudreaux, Plaintiff's economist. Boudreaux testified as to the <u>combined</u> figure for past and future loss of wages in the amount of $1,586,322.00. The jury awarded $455,000.00 in past loss of wages and $1,594,800.00 in future loss of wages for a total amount of $2,049,800.00. Cameron contends that the past loss of wages appears to be the rounded off amount of Plaintiff's annualized gross income for the years since he was injured, approximately $65,000.00, multiplied by 7 years, the approximate number of years since the accident. Cameron further contends that the future loss of wages is noticeably close to the combined past and future loss of wages calculated by Boudreaux─$1,586,322.00. Cameron asserts that the jury's award of past loss of wages in the amount of $455,000.00 should be set aside based on the jury's confusion which resulted in a duplicitous award for past loss of wages. According to Cameron, the figure for future loss of wages should be re-categorized to the total amount of past and future loss of wages awarded and reduced to $1,586,322.00, the

amount calculated by Boudreaux in his trial testimony and the amount asserted by counsel for Plaintiff in his closing argument.

Plaintiff does not dispute Cameron's assessment of Boudreaux's testimony in which he combined past and future loss of wages, but contends that the jury's award, was not based on confusion. Rather, Plaintiff asserts, it was based on the lay, medical and expert evidence presented at trial which lead the jury to believe, more likely than not, that Plaintiff would be unable to return to work in any meaningful capacity. Plaintiff cites Dr. Henderson's testimony that Plaintiff's eight surgeries left him unable to use the left hand for any meaningful work, and that if Plaintiff could work it would be in a light duty capacity. During his direct examination, Plaintiff demonstrated his wrist restrictions to the jury. Plaintiff also cites Dr. Blackburn's testimony in which he recounted to the jury Brayton's emotional distress caused by the accident. Dr. Blackburn explained that Brayton's injury—specifically the chronic pain caused from the injury, the trauma of being removed from meaningful employment, and the fear that Brayton may never return to employment—resulted in severe psychological distress. Finally, Plaintiff cites the testimony of Dr. Neil Gorman, vocational rehabilitation expert, who discussed the employment challenges Plaintiff faced as a result of his psychological and orthopedic issues. Dr. Gorman testified about the Wide Range Achievement Test he administered to Plaintiff which

showed that he read at a 1.6 grade level, spelled at below a kindergarten (K.0) level, and could perform math at a kindergarten (K.0) level.

Upon reviewing Dr. Boudreaux's testimony as to the alleged confusion over the past and future versus total loss of wages, the Court notes that Boudreaux acknowledged the past loss of wages amount he had derived in his report "was to the trial scheduled before."[3] In response, counsel for Plaintiff stated, "I want to just short circuit and not do past and future, just do them as one, past plus future." Counsel for Cameron objected stating there would be "no way to distinguish between what is past and future and what's subject to discount and what is not." Counsel for Cameron withdrew his objection and the parties agreed to discuss the combined past and future loss of wages with their economists. Dr. Boudreaux testified that if Plaintiff was unable to return to work, his total loss of wages would be $1,988,092 by age 67, the Social Security Administration's work-life recommendation; if he worked at a job making minimum wage, or $15,080 annually, that total loss amount would be $1,586,322; if he worked as a light duty truck driver[4]

---

[3] The Court notes that the trial date of this matter was originally December 8, 2014 before a different judge. At least in part because of multiple changes in the trial judge as well as a change in counsel for Plaintiff, the trial dates were reset multiple times. Counsel for Plaintiff indicated to the Court that Boudreaux's original report was dated in 2015.
[4] Dr. Gorman, the vocational rehabilitation specialist, stated that, in his opinion, Plaintiff could perform light duty work. One such job he noted was a light duty truck driver at an annual salary of $29,827.

making $29,827 a year to age 67, his total loss of earning capacity would be $1,193,384.[5]

In his closing argument, counsel for Plaintiff clearly told the jury, "[w]e know, based on the past lost wages and the future lost wages . . . [Plaintiff is] going to go back to work. But you've heard he's going to go back more likely than not in a minimum wage capacity. . . we submit that the past and future lost wages, based on the math that we did in court yesterday, are $1,586,322. The jury verdict form delineated Plaintiff's "past lost wages/loss of earning capacity" from his "future lost wages/loss of earning capacity." The jury wrote in $455,000 as the amount of past lost wages—the amount derived pursuant to Boudreaux's testimony of $65,000 times 7 years. As to the future lost wages, the jury wrote in $1,594,800—an amount very close to the amount Boudreaux derived in calculating Plaintiff's returning to work "in a minimum wage capacity" and as recommended in Plaintiff's counsel's closing argument.

Upon considering the evidence, in particular Denis Boudreaux's testimony, the Court is convinced that the jury's verdict as to loss of earning capacity was "contrary to the overwhelming weight of credible evidence." In particular the Court

---

[5] Boudreaux also stated Plaintiff's total loss of earnings if he had worked to 60.5, Boudreaux's calculation using the Bureau of Labor Statistics: if he never returned to work his total loss of wages would be $1,483,866; at a minimum wage job his total loss of wages would be $1,196,546; as a light truck driver his total loss of wages would be $915,572.

finds that the jury awarded past loss of wages separately and then awarded past loss of wages again in combination with future loss of wages.

Based on the foregoing, the Court finds that a remittitur is appropriate as to Plaintiff's future medical expenses and past and future loss of wages/earning capacity because the issue of damages is separable from the other issues in this case. The Court recognizes that because Plaintiff is adversely effected by this remittitur, he must be given the option of accepting it or electing to hold a new trial. *Falterman v. Schunemeyer*, 153 So. 3d 1284, 1285 (La. Ct. App. 2014).

## IV. Conclusion

Accordingly,

**IT IS ORDERED** that the Motion for New Trial, Or Alternatively Motion for Remittitur [Rec. Doc. 155] filed by Defendant Cameron Inc. is **DENIED IN PART** and **GRANTED IN PART**, in that Defendant's motion for a new trial based is **DENIED,** and Defendant's motion for remittitur is **GRANTED.**

**IT IS FURTHER ORDERED** that the prior Judgment [Rec. Doc. 152] in this matter is **AMENDED,** such that judgment is *conditionally entered* in favor of Plaintiff Braydon Bayard and against Defendant Cameron Inc. in the sum of Two Million Four Hundred Fifty-Six Thousand Five Hundred Seven and 90/100 Dollars ($2,456,507.90),[6] with post-judgment interest on the total amount of the judgment

---

[6] With remittitur, the revised division of damage is as follows:

21

at the rate provided for by Title 28, United States Code, Section 1961, from date of entry of judgment until paid.

      **IT IS FURTHER ORDERED** that Plaintiff Braydon Bayard shall file in the record **within twenty-one (21) days** from the date of this Ruling and Order a written notice to the Court stating whether he accepts or rejects the foregoing remittitur. **If Plaintiff accepts the remittitur, final judgment in this matter, consistent with the findings herein, shall be rendered on the date of acceptance.** If Plaintiff rejects the remittitur, the case of Plaintiff Braydon Bayard versus Defendant Cameron Inc. will be set for a new trial on the issue of general damages.

      **THUS DONE AND SIGNED** this 27th day of June, 2018.

 

**CAROL B. WHITEHURST**
**UNITED STATES MAGISTRATE JUDGE**

---

$968,421.00     Future Medical Expenses
$1,586,322.00   Past and Future Loss of Wages/Loss of Earning Capacity

Leaving a new total verdict in the amount of $3,779,243.00 x 65% = $2,456,507.90